## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 17 2020, 10:42 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ellen M. O'Connor
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Samantha M. Sumcad
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Saul Hernandez-Ramirez, <br> *Appellant-Defendant*, <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff*. | February 17, 2020 <br><br> Court of Appeals Case No. 19A-CR-1458 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Shatrese M. Flowers, Judge <br><br> Trial Court Cause No. 49G02-1006-MR-47029 |

**Brown, Judge.**

[1] Saul Hernandez-Ramirez appeals his conviction for murder and claims that the evidence is insufficient to sustain his conviction. We affirm.

## Facts and Procedural History

[2] On the night of June 5, 2010, and into the early morning of the next day, Elmer Garcia threw a party celebrating the first communion of his daughter, complete with music and drinking. "[M]ore than 15, maybe 20" family and close friends were in attendance, including Anjelica and Laticia Ramirez, aunts to Garcia's wife, and Zulma Garcia-Berez, Garcia's sister. Transcript Volume II at 124. Hernandez-Ramirez, who lived next door to Garcia and who Garcia had known for five or six years, was also in attendance and drinking. Garcia had set up the party between his and Hernandez-Ramirez's trailers.

[3] Jonathan Parilla, who went by the nickname Maymo, was also in attendance. At some point in the early morning, Parilla and Hernandez-Ramirez argued, Parilla attacked and "gave [Hernandez-Ramirez] a head butt," Hernandez-Ramirez fell to the ground, and some members of the remaining five or six people at the party grabbed Parilla. *Id.* at 126. Hernandez-Ramirez stood up and was quiet, and the music continued.

[4] At some point after the argument, Hernandez-Ramirez entered his trailer. Upon exiting, he had a gun with which he shot Parilla several times, killing him. At some point, Hernandez-Ramirez left the scene.

[5] At 5:47 a.m., Lieutenant Gregg Swingle of the Lawrence Police Department answered a dispatch for a person shot and responded to the scene. Despite issues

posed by the language barrier, officers "obtained a suspect name, Saul Hernandez," by 6:10 a.m. With the assistance of a Spanish-speaking officer, officers conducted interviews with individuals who were at the party when the shooting happened. Garcia-Berez spoke with police officers, gave a statement, and selected a photograph of the shooter from a photo array and signed her name under it. Garcia selected a photograph of the shooter from a photo array and signed his name under it. Laticia gave a formal statement at the police station and selected a photograph of the shooter from a photo array and signed her name under it.

[6] On June 14, 2010, the State charged Hernandez-Ramirez with one count of murder.[1] To locate him, law enforcement served search warrants, contacted out-of-state authorities, including Pennsylvania authorities and United States Marshals, and notified border patrol. In 2018, Hernandez-Ramirez was apprehended on a warrant under this cause number in Texas.

[7] At the jury trial, Garcia-Berez testified about the argument between Parilla and Hernandez-Ramirez and answered affirmatively when asked if, at some point, Hernandez-Ramirez entered his trailer. She testified he "went to his house" after the argument, and she stated: "Then he came out. And the shooting occurred." Transcript Volume II at 101. She indicated she saw Hernandez-Ramirez with a gun, stated "Shooting" when asked what he was doing with the gun, and

---

[1] The State also charged him with one count of carrying a handgun without a license as a class A misdemeanor, but the charge was later dismissed.

answered, "To the person that he killed" and "Maymo," when asked what he was shooting at and who it was, respectively. *Id.* at 103. When asked if she was drinking at the party, she stated "a little." *Id.* at 99. During cross-examination, in response to being asked, "during the time of the shooting, were you buzzed, drunk, or had the liquor where you could clearly identify what was happening at the time," she answered affirmatively and stated "I was not drunk." *Id.* at 110. When asked to explain her response about drinking "a little bit," she stated: "Yes, at the beginning of the party. Yes, three beers. But at that time, I didn't have any." *Id.*

[8]     Garcia stated "Mr. Saul" when asked who shot Parilla and, later answered affirmatively when asked if, sometime after the headbutt, he saw Hernandez-Ramirez shoot Parilla. *Id.* at 129. When asked about how far apart the two were when Parilla was shot, he stated, "More or less, I don't remember if from here to the edge of the table or the other way." *Id.* The prosecutor estimated the distance to be "between maybe 6 and 12 feet," and Garcia stated "It could be. It could be." *Id.* After defense counsel showed him a proposed State's Exhibit, Garcia indicated remembering that the police showed him photos when they had spoken and that he recognized the exhibit, identified his signature under a photograph, and answered affirmatively when asked if, when he signed, it was a photo of Hernandez-Ramirez. During redirect examination, he indicated a third time that he saw Hernandez-Ramirez shoot Parilla.

[9]     Laticia testified that, as of June 2010, she had known Hernandez-Ramirez for about a year and Parilla for about two months. She indicated she arrived at

Garcia's party at around 6:00 p.m. that day and she was not drinking. She agreed she heard "something going on between" Hernandez-Ramirez and Parilla and testified "like if they were arguing." *Id.* at 146. When asked what she saw when Hernandez-Ramirez emerged from his trailer, she answered with a question, "When he begun to shoot," and then stated, "Well, he began to shoot we all starting, like, to run, like, to move." *Id.* at 147. She indicated she saw him shoot "[l]ike three or four times." *Id.* at 148. She testified about her statement to the police, identified her signature under photos which were shown to her during her statement, and answered affirmatively when asked: "Your testimony was that Saul was the one that shot Maymo, correct?" *Id.* at 149. During cross-examination, she indicated she was "[a]bout 15 feet, 10 feet" away from Parilla and "[a]bout the same, about 10 feet" away from Hernandez-Ramirez when the shooting took place. *Id.* at 150. She answered in the negative when asked whether she was testifying to anything she did not personally see.

[10]  Fired Winchester-brand .380 auto caliber shell casings were admitted as State's Exhibits 21, 43, and 46, and forensic scientist Michael Cooper testified that the three cartridge cases were fired from the same firearm. Police photo arrays, admitted as State's Exhibits 7, 14, and 15, contain the signatures of Garcia-Berez, Garcia, and Laticia, respectively, under photographs of the same individual. Detective Mark Osborn, who indicated he interviewed Garcia on the morning of the incident and Anjelica and Garcia-Berez on June 9, 2010, testified he asked them to identify Hernandez-Ramirez on the photo arrays. When asked who they were identifying that person as, he stated: "As a person being at the party, as the

person who did the shooting; it kind of varied a little bit." *Id.* at 226. During cross-examination, when asked about Garcia-Berez's 2010 interview and her trial testimony and whether she "in fact inform[ed him] during her interview that she really didn't see or hear anything involved with this incident," Detective Osborn answered affirmatively and stated: "I believe – yes. And I believe her initial – it was that she was kind of at the stairs, outside, going in, if I remember from my notes, correctly. So she was outside, and whether or not she actually saw or heard, I'm not clear." *Id.* at 230. He stated "I believe so" when asked if, during his interview, "she in fact said she never saw a shooter." *Id.*

[11] The jury found Hernandez-Ramirez guilty of murder, and the court sentenced him to the advisory sentence of 55 years to be served in the Indiana Department of Correction.

## *Discussion*

[12] The issue is whether the evidence is sufficient to sustain Hernandez-Ramirez's conviction. When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Jordan v. State*, 656 N.E.2d 816, 817 (Ind. 1995), *reh'g denied*. We look to the evidence and the reasonable inferences therefrom that support the verdict. *Id.* The conviction will be affirmed if there exists evidence of probative value from which a reasonable jury could find the defendant guilty beyond a reasonable doubt. *Id*. As with other sufficiency matters, we will not weigh the evidence or resolve questions of credibility when determining whether identification evidence is

sufficient to sustain a conviction. *Holloway v. State*, 983 N.E.2d 1175, 1178 (Ind. Ct. App. 2013).

[13] Ind. Code § 35-42-1-1 provides that a person who knowingly or intentionally kills another human being commits murder.

[14] Hernandez-Ramirez argues that there was insufficient competent and reliable evidence to sustain his conviction beyond a reasonable doubt. He maintains the gun involved in the shooting was never found and the witnesses did not see the same altercation or same shooting as a result of the lighting, their vantage points, and their alcohol consumption. He contends the witness accounts contained inconsistencies and the language barrier and passage of time between the incident and the trial, while not the fault of the witnesses, "contributed to unreliable evidence which could not meet the State's burden." Appellant's Brief at 12. He further asserts that the witnesses' responses were not very reliable when they were pressed at trial on the variances "about seeing/not seeing the shooting." *Id.*

[15] The State argues the totality of the evidence is sufficient to prove Hernandez-Ramirez committed murder. It contends multiple witnesses, who were present at the time of the shooting, testified that Hernandez-Ramirez was seen entering his home, coming out with a gun, and opening fire on Parilla; that a single gun was used in the shooting and he was the only person seen with one at the time; and that it presented evidence he fled the state and remained at large for eight years.

[16] The record reveals several attendees at Garcia's gathering remained until Parilla at some point argued with and attacked Hernandez-Ramirez, who afterwards entered his trailer. The State presented the testimony of several witnesses who observed the events which unfolded when Hernandez-Ramirez emerged. Garcia-Berez testified she saw him with a gun, Laticia testified he began to shoot and everyone started to run and to move, and Garcia testified he saw Hernandez-Ramirez shoot Parilla. Hernandez-Ramirez left the scene and was ultimately apprehended on a warrant in Texas in 2018.

[17] To the extent Hernandez-Ramirez points to the length of time between the murder and his trial, we note that Garcia-Berez, Laticia, and Garcia each spoke with law enforcement shortly afterwards, they separately selected Hernandez-Ramirez upon being presented with a photo array and asked to identify him, and copies of the photo arrays and their signatures were admitted at trial. The jury was able to weigh the State's evidence and the credibility of the witnesses and reasonably infer that Hernandez-Ramirez was the person who had shot Parilla.

[18] Based upon the record, we conclude the State presented evidence of probative value from which a reasonable trier of fact could have found Hernandez-Ramirez guilty beyond a reasonable doubt of murder.

[19] For the foregoing reasons, we affirm Hernandez-Ramirez's murder conviction.

[20] Affirmed.

Baker, J., and Riley, J., concur.